Final case for argument this morning is United States v. Jackson. Ms. Lee. Good morning. May it please the Court. Tyler Lee for the United States. I'd like to reserve five minutes of my time for rebuttal and I'll watch the clock. The Federal Vacancies Reform Act, which applies broadly across executive agencies, is one of several alternative and overlapping mechanisms that the government can use when there is a vacancy in the office of U.S. Attorney to ensure that that office remains functioning. The District Court here made two critical errors in applying the FVRA to disqualify Sigal Chadha from supervising defendants' prosecutions in the District of Nevada. First, the District Court adopted an overly narrow and atextual view of the FVRA in holding that a first assistant can serve as acting officer only when that person was the first assistant at the time the vacancy arose. Second, the District Court incorrectly concluded that the FVRA prohibits Ms. Chadha from supervising the U.S. Attorney's office as first assistant pursuant to a delegation of authority from the Attorney General. This Court should reverse the District Court's disqualification order. Can I ask you at the outset to say a bit about the 28-J letter that I received the ECF email at 8.40 this morning? Is that – am I correct in understanding that that is – I mean, the nomination affects the clock under 3346, but that's only relevant if we conclude that Ms. Chadha was in fact validly serving as acting U.S. Attorney. Is that right? And it doesn't bear on that question, does it? That's correct, Your Honor. This Court will still have to resolve whether she's eligible to become the acting U.S. Attorney in the first place as a non-incumbent first assistant. If this Court concludes that she was, then she may continue validly serving as acting while the nomination is pending under 3346. Turning first to the text of 3345A1, the text does not require the first assistant to be the first assistant at the time the vacancy arose, and the District Court here itself conceded that Congress didn't say that the first assistant must be serving when that vacancy arose. Rather, 3345 states that the first assistant to the office, not to the departed officer, shall be the acting. Doesn't the use of the definite article in the first assistant suggest that it's referring to a specific person? I don't think so, Your Honor, because there can really only be one first assistant to the office at any given time, so I think that the just clarifies that it is the first assistant to the office. And again, I think it's a depersonalization of the language that we can see from the textual history alone of the statute, because before 1998, the statute referred to his first assistant, meaning the first assistant to the particular departed officer, and the FBRA changed that language and changed it to the first assistant to the office of such officer. Well, I mean, if we're going to look at the enactment history and the amendment history, I mean, I think I thought it was pretty clear, and I think the government took this position in Southwest General in its brief to the Supreme Court, that the whole point of the Vacancies Reform Act was, I mean, it was prompted by Bill Lanley, right? And he was, they put him in as principal deputy to the AAG for Civil Rights so that he could then be acting, and Congress didn't like that. I mean, isn't the whole point of it to prevent backfilling of vacancies by putting in somebody as the first assistant after the vacancy arises? Well, first, Your Honor, I just want to be clear that I think the textual history supports our position just looking at the change in the text without even resorting to the legislative history and purpose. But the FBRA ultimately was a compromise, and while I do agree that it created certain restrictions on acting service in response to Bill Lanley and other things that were happening at that time, it broadened acting service in other ways. So the main changes that the FBRA made were, first, were exclusivity, clarifying that the FBRA is the exclusive means for designating an acting officer and emphasizing that the government can't use general delegation statutes to make someone the acting, which is what they were doing, for instance, in the case of Bill Lanley. And the FBRA, second, created restrictions on acting service by nominees, which was also a circumstance that was occurring with Bill Lanley. He was nominated, he was rejected, and the FBRA now prescribes certain restrictions on when a nominee may also serve as the acting. But I think going back to the point that the FBRA was a compromise and that it broadened acting service in certain ways, it increased the length of time for acting service, for instance, to 210 days. It added A2 and A3 to give the executive branch more options for filling vacancies, and it depersonalized that first assistant language, as I've discussed. One of the points that the District Court made, and I think the Third Circuit did in Giroud, is that A2 and A3 seem not to have a whole lot of practical significance, if you're right, about how A1 works. So can you address that? Yes, Your Honor. I don't think that's correct because there are multiple circumstances, as we've explained, in which A1 cannot be used to select an acting officer, and so A2 and A3 come into play. As we explained on the first day of this current administration, the President designated at least 27 officers to serve in acting capacity pursuant to A2 and A3. So depending on how a first assistant office is filled, A1 may not be available. If that first assistant office is also a PAS office, so it also requires Senate confirmation, then A1 isn't available. The President has to use A2 or A3. I mean, I know this is a government-wide statute, but just in DOJ, how many such positions are there? The DAG is the first assistant to the AG and a Senate-confirmed. Who else is there? The Solicitor General, Your Honor, is one such PAS position, although the first assistant to the Solicitor General is not a PAS office. It is not, right. Okay, sorry, but I'm talking about... Within DOJ, I don't believe there are that many, but I would resist any suggestion that just because there are comparatively few positions where the first assistant is also PAS office, you know, there are thousands of... There are over 1,000 PAS offices in government, but even if it's comparatively rare, that doesn't mean that it's superfluous. It's not unreasonable to think that Congress would have wanted to allow presidential discretion for some of the most important roles in government, these critical agency heads and deputy secretaries, while allowing more flexibility to allow the agency head to designate first assistants for lesser roles within an agency. What happens to Section 546 under the government's interpretation? What's the point of 546 if the government ultimately can do what it did in this case and at least theoretically continue to have what amounts to an acting U.S. attorney simply by replacing the FAUSA? So this Court recognized in Hooks that the FVRA, which is a generally applicable statute across agencies, and then agency-specific statutes that provide for temporary fillings of vacancies within specific agencies, that those are both available and alternative options for the executive branch to use when there's a vacancy. So Hooks dealt with the NLRB, but the same applies here for the FVRA and for Section 546. They are two methods that the government, that the executive branch can use when determining how it wants to temporarily fill that vacancy in the U.S. attorney position. And they are independently available, and the government can choose between them. And theoretically, can you use both the FVRA and 546 to have the same person come in? So at some point, they're the acting U.S. attorney, that expires, they're the interim, that expires, they're the acting. Can you just, can the President or the Attorney General simply have the same person come in, just alternating using the FVRA as well as 546? I think that's right, Your Honor. Subject to the time limitations within each of those statutes, which again are separate, defendants incorrectly suggest that we should somehow read the 120-day limit in 546 into the FVRA, which has its own time limits. We would reject that suggestion. But again, as this Court recognized in Hooks, those two statutes are independent and available alternatives for filling the vacancy temporarily. Would there be a time constraint? So would the clock run anew once you alternate that individual? So Ms. Chata is in under 3345. She's out. She's back in under 546. She's out. She's back in under 3345, et cetera. No, she would not be. Well, it depends on the precise circumstances of the case, Your Honor. But the clock in the FVRA, the 3345A1 clock, or at least also in 3346A1, when there's no nominee, the 3346A1, the clock runs from when the vacancy occurred. So once that clock has run tied to the initial vacancy, then there can be no acting officer under the FVRA, unless, of course, there's a nomination, as we now have. And just to follow up on that, the clock under 3345, I mean, it's reset when there's a confirmed U.S. attorney, and the nomination can affect it, too. But is it your view that an interim appointment under 546 does not reset the clock, the 3345, or 3346, excuse me, 210-day clock? It is our view that the interim appointment resets the clock, or that the resignation of an interim creates a new vacancy for FVRA purposes. But that question is really academic. This Court doesn't need to decide that question. But doesn't that suggest that the answer to Judge Blumenfeld's question is, like, yes, you can just shuffle the same person back and forth, and they get the 210 days as acting, then they get the 120 as interim, then they can go get 210 as acting, and so on? Well, no, Your Honor, because, again, when an interim term ends, there's also the opportunity for the District Court to appoint someone under 546D. And again, it would depend on the specific circumstances of when the vacancy occurred. But presumably, the government would suggest that the President is fully capable of terminating the selected candidate of the District Court. So perhaps it's not continuous. There may be a break by one day or so here and there. But essentially, there would be an easy workaround to allow, if we interpret the statutes as you're suggesting, to allow the Attorney General to have one person in almost the entire time, even if there is no ultimate confirmation of anyone. It is correct that the President can remove a U.S. attorney under 541C. But I think, again, there would still have to be, there's still always a reconsideration of who might be the best potential person for that position while we are working to fill that office with a nomination. Again, as has happened here, there has been a nomination. And so, again, the answer to this question is not one that the Court needs to resolve, this question of the interim vacancy. Well, I mean, maybe we do, because if it is true that your position means that there's really no need for anybody ever to be nominated because you can, you know, subject to the one-day breaks every few months, they can just be shuffled back and forth between being acting and being interim. I mean, that one might think that that is a reason, you know, not to read the statute to permit that result, because it seems contrary to the whole structure of what the statutory scheme is setting up. Well, I think, Your Honor, again, under our view, the statute does not, the statute does not require, again, the first assistant to be the incumbent at the time, the plain text of the statute. And that's not functionally what is happening in these cases. We're continuing to nominate U.S. attorneys. We're making every effort to fill these vacancies. And Senate confirmation of U.S. attorneys has real benefits that we want to take advantage of. Returning to the FVRA, I want also to emphasize the structure of the FVRA, because Section 3345 does not require any prior service for a first assistant under A-1, whereas in contrast, it does require that under A-3 and B-1a. And I also want to emphasize the longstanding practice that the executive branch has used A-1 to bring in non-incumbent first assistants to be acting officials consistently since 2001. And presidential transitions really wouldn't be possible otherwise. GAO, an arm of Congress who is charged with enforcing the FVRA, agrees with this practice. And there are numerous examples, as cited in our brief, from administrations of both parties. But that has not been the consistent view of the executive branch, right? OLC, right after the FVRA was passed, OLC answered this question the opposite way, didn't they? Briefly and initially, yes, Your Honor. But it was only, I believe, a span of a few years immediately after the FVRA's enactment. And then OLC then changed its view and has consistently held the same view since 2001, so for 25 years now. And that's the view that GAO agrees with as well. Are you suggesting that some sort of deference is owed to that view? And if so, what is the basis for that? That's not our view, Your Honor. Our view is that GAO and Congress have acquiesced to this interpretation of the statute because it has been that longstanding interpretation and Congress has not acted to change it despite this routine practice by the executive branch. So our contention is not that deference is warranted necessarily to those views, but rather that it shows a shared and acquiesced upon interpretation of the statute. Could you say a bit about your alternative argument about the delegation? And I guess my question there is, just so I understand the role that Ms. Chata has in her designation as special attorney, if the criminal chief in the District of Nevada were to decide that he or she wanted to indict somebody and Ms. Chata thought that that person should not be indicted, would the criminal chief view that as, you know, a suggestion or would that be a directive that the criminal chief would be required to follow? I can't speak to the specific practices of the individual U.S. attorney's offices, Your  I'm not— Well, I'm not asking you to speak to what is the role of the person that this case is about. Sure. Well, the first assistant is the person who supervises the U.S. attorney's office when there's no U.S. attorney. So Ms. Chata, as the first assistant, would be supervising that office and would be able to make supervisory decisions over criminal chiefs, civil chiefs, and so forth. Basically, anything that an employee of that office might do, Ms. Chata has the authority to direct them to do it, to refrain from doing it, or to do it in the manner that she directs. Is that right? I think so, Your Honor, as is the common and accepted practice for first assistants, particularly where there's a vacancy. You know, as we explained in our brief, there's been other instances in the past where first assistants have led U.S. attorney's offices pursuant to delegated authority when the office of U.S. attorney was vacant. So, for instance, the Arizona U.S. attorney's office between 2017 and 2019. And the district courts now in Central California and in New Mexico have recognized this and in their rulings allowed individuals to lead U.S. attorney's offices as false pursuant to delegated authority. So what is your answer to the argument in which the Third Circuit accepted in Giro that in these circumstances, Ms. Chata is functionally acting as the U.S. attorney. And other than not having the title, that's what she is de facto. And that is contrary to the exclusivity of the FVRA. Well, she's exercising all of the delegable functions of U.S. attorney. But I think Gerard and the district court here were wrong to conclude that Section 3347 of the FVRA prohibits that because there's the FVRA doesn't provide any restriction on the exercise of delegable functions of an office by someone who's not serving as the acting official. And as first assistant, Ms. Chata is not serving as the acting official. And are there any non-delegable functions? Because I believe you told the Third Circuit that there weren't. But in your brief here, I think you suggested that there are. So what are the non-delegable U.S. attorney functions? Candidly, Your Honor, in our view, there are no non-delegable functions of the U.S. attorney, which is not uncommon for offices. But again, that's not always going to be the case. The FVRA is a generally applicable statute. So in some circumstances, there are offices that have exclusive and non-delegable functions. But I would also note that we're here in the Ninth Circuit. This court in Weyroush has indicated that there are limits potentially on the delegation of Section 3731 certification authority, that that is entrusted to the U.S. attorney personally by statute. So courts can and potentially have created these distinctions and on the delegability of functions. And that, I think, goes back to the key distinction between someone who is an acting versus someone who is just performing the functions by delegation. And one of the key differences is the title, which is not just a title. It's the title and it's the authorization to perform all of the functions and duties of that office, including the exclusive functions and duties. So it removes any legal doubt that that person is fully empowered to perform all of those duties without needing to check whether each and every duty is delegable, without facing litigation risk over whether a duty may be delegable. So the acting can really do anything, whereas there may be doubt about whether the delegee can do a particular function, for instance, a 3731 certification. And just on 3731, so we've suggested that it's not delegable, but the government's view is that it is? Our view is that it is delegable, Your Honor. This court in Weyroush said, for instance, that an attorney appointed under Section 515 couldn't do that delegation without more. So it's a bit unclear, I think, in Weyroush what exactly the limits of any delegation may be. But it is, I think it clearly shows that it is a potential distinction between someone who's an acting U.S. attorney and someone who's exercising the functions pursuant to and reinforces that there could be litigation risk when someone is acting just by delegation about whether they can actually perform certain functions. So just to be clear on the government's delegation theory, the critical point is that the government here has not imposed a title or isn't giving the Ms. Chodol the title of being an acting or interim U.S. attorney. Is that right? The title and, again, the authorization to perform all the functions and duties. I heard that piece of it, but I thought I also heard you suggest essentially that there is no delta between what was delegated and what authority she has. That there is no remnant. There is no residual. In this case, yes, Your Honor, for this particular office. But again, this court should not interpret the FERA solely turning on the office of U.S. attorney because it is a broadly applicable statute. And Congress recognized in enacting the FERA, and Arthrex talks about this, that Congress knew full well that many PAS offices do not have any non-delegable duties. Congress knew that. It nevertheless limited the FERA's remedial provision 3348 to exclusive functions and duties, and Congress retains the ability to alter that balance in the future if it wants to add more exclusive or non-delegable functions. Thank you. Your Honor, reserve the rest of your time. Mr. Barron. Good morning, Your Honors, and may it please the Court. The District Court correctly concluded that Ms. Chadha is ineligible to be the acting officer under Section 3345A1. The District Court also correctly concluded that the Attorney General cannot make her a de facto acting U.S. attorney through the use of delegation given the prohibition in Section 3347. But the District Court erred when it declined to dismiss the indictments, which the government obtained while Ms. Chadha was invalidly leading the office. We're therefore asking this Court to affirm the District Court's ineligibility determination, but reverse as to remedy and remand with instructions to dismiss the four indictments. Now today, unless the panel prefers otherwise, I'll address those three issues in that order, 3345, 3347, and remedy. Starting with Section 3345. Subsection A1 creates an automatic default rule. When the vacancy occurs at that moment, the individual serving as first assistant at that moment becomes the acting officer without any need for executive branch involvement. The provision does not allow the government to wait until months after the vacancy occurs, choose anyone in the country, hire them into the agency, backfill them into the first position, and therefore make anyone in the country the acting officer. But what happens if the U.S. attorney resigns? The first assistant is the acting, and then the next day, the first assistant dies or becomes unable to perform the functions of the office. What happens in that circumstance? At that point, the administration has plenty of flexibility. The president can make an A2 or an A3 designation. The attorney general can invoke Section 546. Perhaps if there is a recess, there could be a recess appointment, or what should be the typical case, the president should nominate and seek swift confirmation. But the agency cannot backfill in a new first assistant to solve that problem. But can't Section 3345 A1 reasonably be interpreted to allow in that circumstance another FAUSA, essentially, an appointment of a FAUSA, and that person essentially obtaining the position of acting? No, Your Honor. That's inconsistent with the text, the structure of the statute, as well as legislative history and purpose and all of the persuasive authority that's been collected in the past year and before as well. And does it come down to the use of the definite article, the, or is there which would support the position? But is there any other textual clues that we should look at that would suggest that 3345 A1 can only be interpreted in the manner that you suggest? There are three main textual arguments. The definite article is one. The second would be the use of the term vacant office in A2 and A3, referencing a continuing state of a vacant office when that language does not appear in A1. And when the statute typically uses the phrase vacancy as in 3346 to reference a specific moment in time. So that's the second textual argument. And then the final textual argument is the use of the present tense framing as opposed to the present perfect framing, which perhaps would support the government's view of the statute. But even if the textual arguments were not compelling on their own, and we think they are compelling enough to decide the case, the structural arguments are overwhelmingly in favor of the district court's interpretation. Congress carefully crafted the structure of this statute to have A1 serve as an automatic default rule without executive branch involvement. And then A2 and A3 grant the administration some post vacancy discretion to make new selections. But Congress carefully limited the scope of that post vacancy discretion, first by requiring the president and only the president to make the selection. And second, by restricting who would be eligible as a post vacancy acting officer under A2 and A3 and those eligibility requirements. The government's view of A1 totally undermines that carefully constructed structure because A1 swallows A2 and A3 in all but the most unusual and unlikely circumstances. Government counsel referenced the possibility that you could have an officer whose first assistant also requires Senate confirmation, which makes backfilling more difficult. I believe there are only three officers in Maine Justice who have first assistants who require Senate confirmation. That would be the Attorney General, Deputy Attorney General, and Associate Attorney General. But there are hundreds of executive branch offices within the Department of Justice who do not have first assistants who require Senate confirmation. So the structure of the statute would be totally reformed from what Congress enacted if it did in fact allow for backfilled first assistants. Does the act only apply to the Department of Justice? It does apply throughout the federal government. And it's a difficult task to try and count up exactly how many offices have first assistants who also require Senate confirmation. Our point is, as far as we can tell, it's very rare. And the government hasn't given a serious explanation for why it's not rare. And if there is an interpretation of an act that would make two of the three provisions totally unnecessary in all but unusual, rare, unlikely situations, that's a heartland surplusage problem under the Supreme Court's TRW decision. And that's the situation that we have here. Can I ask you about how you think 3345 interacts with 546? So this is sort of a variant on the first hypothetical you got from Judge Blumenfeld. So imagine you have a confirmed U.S. attorney resigns. FAUSA becomes acting, I guess, for 210 days. Eventually, the district court makes an appointment under 546D. And let's say the district court appoints the person who had been FAUSA and had been acting. So now that person is there under the district court appointment. That person designates one of the AUSAs in the office to be FAUSA. And now the district court appointed person, you know, dies or resigns. So does the person, the new FAUSA who was designated by the district court appointee, can that person be acting now? No, Your Honor, because the clock under the FVRA starts at the moment the vacancy occurs, meaning the departure of the Senate-confirmed individual. So 3346 flows from that point in time. The departure of the 546D interim U.S. attorney would not trigger a new clock under the FVRA. Now, the first assistant at the time of the vacancy could potentially take over the acting officer role again if there were nomination under 3346A2. We haven't had the opportunity to brief that issue. I don't want to make any concessions on that. But that would be the government's position there. But here we have a situation where Ms. Chadha was not eligible to be the first assistant because, was not eligible to be the acting officer because she was not the first assistant at the moment the vacancy occurred. And if there is no FAUSA in the position at the time the vacancy arises, then what? Then the president can invoke A2 or A3. The attorney general can invoke Section 546. If there's a recess, the president can make a recess appointment. Or what should be the typical case, there should be a nomination and effort, a swift confirmation, because that should be the default rule for filling vacancies under the Constitution and the Appointments Clause. And even if a FAUSA was announced, for example, in my hypothetical, so a person was named, but they were going to take the position coincidentally on the day that the U.S. attorney dies or resigns. If the first assistant is named before the vacancy occurs, even if very shortly before the vacancy occurs, then that person can serve as the acting officer under A1. Based on what analysis in light of your interpretation of 3345 A1? The statute requires the first assistant to be serving at the moment the vacancy occurs. It doesn't impose a length of time requirement. You don't have to have been the first assistant for any specific period of time leading up to the vacancy, but you have to have been the first assistant in the present at the moment the vacancy occurs in order to be eligible under A1. If that's not the case, then the president turns to A2 or A3 or the other options I discussed. But if the announcement, and perhaps I didn't state this clearly, if the announcement predates the vacancy, but the actual taking of the position postdates the vacancy by a day, in that circumstance, what happens? Then you'd have a question about what's the effective date, the date of the announcement or the date of the swearing in or whatever the formal event occurs. I don't know that we have a position on which of those dates would control. Perhaps there's an argument that the announcement date would control and therefore you'd be eligible under A1. If you could perhaps turn to delegation. With respect to delegation authority, what if the attorney general delegates all responsibility for criminal, of the criminal division to Ms. Chattel, but doesn't grant the authority for the civil division of that office? In that circumstance, is there any problem with Ms. Chattel making all decisions and acting in that position? Yes, Your Honor. For the criminal division, forgive me. Yes, Your Honor. And I want to be clear that's not this case. We haven't had the opportunity to brief the issue. I know the issue has arisen in the District of New Jersey. If the court wanted to reach that issue, we would invite supplemental briefing on that so we could see the government's position about why that's appropriate. But I suspect we would take the position that's not appropriate. And there's two potential ways to think about that situation. One is that 3347 says no delegation. If there's a vacancy, you can't use, the agency head can't use delegation authority to try and fill it. It doesn't matter whether the agency head is using delegation authority among one person, two people, three people, 50 people. It's a prohibition on using delegation to avoid the exclusive provisions of the FVRA. That would be a frontline. But the office, I mean, the office had, presumably the District of Nevada had and still has a criminal chief, right? And so if there's, you know, a vacancy at the U.S. attorney position that, you know, can't or hasn't been filled, the criminal functions of the office don't just cease to exist. They have to reside in somebody. So is it your view that the criminal chief can't just go on being criminal chief? It would certainly reside in the attorney general. The attorney general could step in and exercise supervisory functions over the office. Short of that, I'm not sure there's a solution that complies with the FVRA. But again, that's not this case. We haven't had the opportunity to brief it. We don't know what the government's explanation would be for why the functions of the office can continue without somebody in place leading it. I mean, I guess, I mean, I take the point that it's not, I mean, it's not this case in the sense that what happened here is different. But I'm not, I feel like we maybe do need to understand what the answer to that is in order to understand your theory of what's a, what the line is between permissible and impermissible delegations. So why, I don't know if you can address that. If the office is vacant, the attorney general can step in and the criminal chief can continue under the direct supervision of the attorney general. Short of that, I'm not sure there's an alternative solution. If we're in a situation. But what, and what is that? I mean, isn't, isn't that what Ms. Chata in Judge Blumenfeld's hypothetical would have been doing? I understood the question to be the attorney general says, you know, you are now in charge of all the criminal cases. You are effectively the criminal chief under the supervision of the AG. So what's, but I thought your answer was that that would be impermissible. There would be a difference between the office being vacant and the attorney general stepping in and the criminal chief continuing versus what I understand to be occurring in New Jersey, which is there are three de facto acting U.S. attorneys. One who is the de facto acting U.S. attorney for criminal, one for civil, one for administrative. And so that second hypothetical is impermissible because 3347 prevents the use of delegation to fill vacancies. And how, how is what the criminal chief does when there's nobody above her different from being what you're calling the de facto U.S. attorney for criminal cases? If the attorney general is stepping in when the U.S. attorney position is vacant and supervising the office, that's permissible under 3348. So that would be a way to keep the functions of the U.S. attorney's office working while there is a U.S. attorney absent. But otherwise there needs to be a U.S. attorney there. And the way to put a U.S. attorney in place at this point would be either a nomination and confirmation, a 546D appointment. Those would be the options available. What does it mean to say the attorney general is stepping in? If there is a vacant office, the responsibilities associated with that office flow back up to the agency head under 3348. So the agency head can step in and perform the role of that vacant office. But as a practical matter, is it your view that the attorney general steps in but essentially can't delegate any authority to any of the underlings of the office, including the criminal chief, the civil chief, et cetera? The criminal chief can continue to work under the attorney general's supervision, but there can't be a delegation where the attorney general purports to be running the office but then just delegates all the supervisory functions to one or more people because that would be impermissible under 3347. Is there any practical distinction between the two situations? There is, because in one situation you have three individuals, two, three individuals who are co-equal, who are the de facto acting U.S. attorneys in the office. In the other one you have the attorney general stepping in under 3348 to perform the functions of the vacant office while it remains vacant. But again, I want to emphasize this is not a case where the attorney general has tried to carve up the responsibilities of the vacant office among multiple people as appears to be the case in New Jersey. The issue here is can the attorney general name one de facto acting U.S. attorney by delegating all the responsibilities associated with that office to one person and 3347 says no. And so, I mean, if the attorney general had said, you know, I'm really concerned about the prosecution of Mr. Jackson. So the delegation to Ms. Chata was purely, you know, you're the special attorney for the Jackson case and nothing else. That would be a valid delegation, right? That would likely be permissible, yes. So the problem is that she was given too much other authority at the same time? That's right. And one way to think about it would be if there is a delegation that creates an officer within the meaning of Lucia and the difference between employees and officers, that's impermissible under 3347. That would be a backup argument to our frontline argument, which is no delegation is permissible under 3347. The alternative argument to address a potential situation like in New Jersey would be to say maybe the attorney general can diffusely delegate the responsibilities of the office among multiple people. But if the attorney general is delegating so much responsibility to so few people that the package of responsibilities carries significant authority, significant discretion within the meaning of Lucia, then 3347 prohibits that. But again, I want to emphasize we have not had the opportunity to brief this issue because the New Jersey situation has not occurred yet in Nevada. If it will occur, we don't know. And so if the court wants to reach those sorts of follow-on questions, we do suggest supplemental briefing may assist the court in resolving those questions. But counsel, how is a court to make a determination if delegation reaches a point which a court has to decide is too much? It crosses the line such that the person becomes a de facto officer. How can a court and how could we be expected to make that determination? Because the Supreme Court has a test for that in distinguishing between employees and officers within the meaning of the Appointments Clause. And that test could well apply to this scenario as well, even though it is a fairly unprecedented situation. I do want to spend my remaining moments on remedy unless there are further questions on delegation. Dismissal is the appropriate remedy in this case. There are three reasons why. The first is under the Federal Vacancies Reform Act itself and Gonzales. The second under Bundy. And the third as a remedy for the Appointments Clause violation. I will try and briefly address all three. First, under Gonzales, if there is an invalid acting or de facto acting officer exercising delegable authority, that action is voidable, although there are potential defenses. The government has raised a harmless error defense. That defense is unsuccessful because either the presence of an invalidly serving U.S. attorney is a structural error or is harmful in the conventional sense, as the D.C. Circuit explained in Southwest General involving the NLRB general counsel bringing labor complaints. Because you don't know if a different person would have exercised discretion differently and directed the assistant U.S. attorney not to bring that prosecution. Under Bundy, the court has authority, inherent supervisory authority, to issue sanctions to deter misconduct and to preserve the integrity of the federal judiciary. Under the Appointments Clause, defendants are entitled to remedies with bite to cure an Appointments Clause violation, a remedy that will provide incentives to individuals to litigate these types of challenges. The appropriate deterrent remedy would be dismissal. The appropriate remedy with bite to give incentives to defendants to raise these issues would be dismissal. The disqualification remedy is insufficient. And why do we have jurisdiction over that? I mean, the disqualification is a collateral order that's immediately appealable, but non-dismissal of the indictment generally is not. So why is it appealable now? I see my time's up. I'm happy to, thank you. There's pendent appellate jurisdiction over the cross appeal. There's interlocutory jurisdiction over the disqualification ruling, and we're asking the court to review the entire ruling, both the disqualification ruling and the further remedial analysis under the pendent appellate jurisdiction doctrine because all of these issues are inextricably intertwined. There was one set of motions, identical motions leading to one order. The government is trying to appeal that order. We're asking the court to review the entire inextricably intertwined order. But I mean, we just spent almost 45 minutes talking about all the FVRA and delegation things without having said anything about the remedy. It seems that they are not intertwined in the sense that it seems quite possible to analyze one without considering the other. That certainly is one formulation of the test, but this court's Marx decision talks about orders where the reasoning is impossible to separate, generally analyzed together, not susceptible of independent review when one order is dependent on both the reasoning and results of the other order. And the orders here, the one order, the disqualification portion and the dismissal portion are inextricably intertwined under that test. And if I could just provide some concluding remarks on that. The Supreme Court in Swint talked about the policy concerns that require a limited understanding of the Pen and Appellate Jurisdiction Doctrine. You don't want a situation where you've got a litigant who really just wants to appeal a non-collateral order and is going to find some way to gin up a collateral order and then raise the non-collateral order as a tagalong. If that happens, then the appellate courts would be flooded with all sorts of interlocutory appeals that are inappropriate. There simply is no equivalent policy concern in this situation. There's no conceivable gamesmanship or perverse incentives here. There is one order resolving one motion. It would advance judicial economy for the court to resolve the entire motion now. Thank you. Thank you. Mr. Pierce. Good morning and may it please the Court. James Pierce for the Nevada Attorneys for Criminal Justice and the National Association of Criminal Defense Lawyers. The district court's disqualification of Sehgal Chattah was correct for two principal reasons. First, she was not the first assistant at the time that the vacancy arose. And second, any purported delegation from the attorney general squarely conflicts with the FBRA's exclusivity provisions and a contrary holding would squarely conflict, excuse me, would undermine one of the central purposes of that statute. More broadly, the executive branch's efforts to install Ms. Chattah circumvents three statutes that Congress put in place to safeguard the appointment of a U.S. attorney position, a position that Robert Jackson, when attorney general in 1940, observed has more control over the reputation and life than any other person in the United States. I'd like to just step back and make a couple of broader points in the brief time that I have up here. One of the themes in the government's position, both in this case and some of the other litigation throughout the country, is that because the power to investigate and to prosecute is such a core executive power, a preclusive and conclusive power under the Supreme Court's decision in Trump, United States versus Trump, that it therefore follows that the executive branch should play a sort of leading role in selecting the actual U.S. attorney. And of course, that nomination is important. But I think that writing out the role for the Senate and for the courts is inconsistent with both the appointments clause itself, as well as what Alexander Hamilton said when he talked about the role of checking favoritism and excluding unfit characters. Now, to tie that more directly to the issues before the court, I think on the issue of delegation, to be sure the attorney general has power under various statutes to oversee federal litigation and to direct U.S. attorneys. But it does not follow from there that the attorney general has the power to actually exclusively name the person who comes in and fill that role. And specifically on the question of delegation, the idea that the attorney general could simply delegate to a person all of the authorities to run an office would make superfluous all of those statutes that have already been discussed for putting in place a U.S. attorney. It would overlook the historical role that the U.S. attorneys have played. So from many of the individuals, the framers that wrote the appointments clause also were involved in the passing of the 1789 Judiciary Act, under which U.S. attorneys were born. And they were there appointed by courts, not something, a role that was played by the executive branch. The approach of allowing the attorney general to delegate this kind of full power would also be inconsistent with the delegation statutes on which the attorney general purports to rely, like 508, 509, and 515. Those are statutes that were historically used to assign an attorney to go and handle a discrete matter, maybe a type of cases. For example, Francis Heaney was a special counsel who went and actually prosecuted a U.S. attorney who himself was involved in crooked land deals. And so, yes, there may be some challenging questions. Judge Blumenthal, you raised some, and I think Judge Miller, you as well, about where there could be, so where one draws the line between an acceptable sort of time-limited or case-specific or set of case-specific limited delegations, which is, I think, permissible under the text of 515, which talks about legal proceedings. But that is far afield from what this case presents, which is a delegation of, as I think the argument and discussion this morning has made clear, the full powers of the office of the U.S. attorney. Make one last brief point before I sit down. It is not at all the case that the, sort of, affirming the district court would hamstring or hinder the administration at a time of transition. I think it's important that under 3345A3, which was enacted as sort of, through the discussions of the FERA, sort of its final discussions that allows for a sufficiently senior government official to come in. Even in times of transition, you have, as the Supreme Court said in Southwest General, a wide array, is the language they use, of officials who could come in and fill that position. And this administration has done that. I believe James McHenry, who served as the acting attorney general in the very early days of the administration, was an A3 appointee and ran the government in that way. And so that's the type of tool that is already available. And I see my time is up. If there are any questions, otherwise we should affirm. Okay, thank you. Thank you. Ms. Leahy, rebuttal? Yes, your honors. One brief point on the FERA acting issue. We agree with your honor's suggestion that if an interim court-appointed U.S. attorney dies, you know, a 546 U.S. attorney dies, then the first assistant should be able to step in and be the acting. The attorney general should reasonably be able to designate a first assistant to fill that role while we work to fill the permanent position. But the main points I want to make are about delegation, which the AG, again, has clear authority to, textual authority under Section 510 to delegate all of her duties, including the non-exclusive duties of U.S. attorney. And this is consistent with longstanding practice where all three branches of government, executive branch, GAO, the district courts in Central California, the Federal Circuit in Arthrex, all agree that the FERA does not restrict the delegation of non-exclusive and delegable duties. As Judge Blumenfeld suggested, the defendants here have a significant line-drawing problem. When does someone stop becoming the de facto U.S. attorney? At what point does a delegation become permissible? Is it okay if we delegate all but one function? Is it okay if we delegate criminal cases only? I think defendants suggested that, delegating the duties to three different people is still not permissible. Well, again, at what point does that become permissible? If we delegate the duties spread among four people, five people, six people, is that permissible? The better view is that the FERA simply by its plain text does not restrict the delegation of delegable duties. But counsel, does the line-drawing problem necessarily mean the government wins in this case? I'm not so sure that I agree with counsel that we can't and shouldn't consider some of these problems and the line-drawing problems of the rule that we may be creating here. But does it mean that you win when essentially what was done here can be readily concluded to be a de facto acting official? Again, I think it's not a de facto acting official, Your Honor, because as we've explained, there are key distinctions between being an acting and being a delegee, and there's risk associated with being a delegee. Again, I would go back to the fact that all three branches of government endorse this practice. It's necessary for many agencies to continue functioning when the office of agency head is vacant. But the risk associated with being a delegee, I mean, it seems like it's principally the risk that you would lose this case. If you win this case and we say that it's fine, what is the risk that would be faced? That litigants could continue to challenge that person's authority with respect to certain functions that they claim are exclusive and non-delegable. So for example, 3731 certification, can a delegee do that? For instance, authorization for tax returns, that's another statute that is one that the U.S. talks specifically about something the U.S. attorney is supposed to do. There could be continued challenges to what are the limits of a delegee's power and what duties are delegable or what duties are not delegable. And just very briefly, I also want to address defendant's suggestion that the AG has to step in. I think that's what the AG has done here, and she can delegate all her functions pursuant to 510. Here she has made a limited delegation for Ms. Chada to supervise prosecutions in the District of Nevada, all those, as I said, non-exclusive duties of the U.S. attorney, and she's being supervised here by the Attorney General. Defendant's reliance on 3348 in this context, I'm sorry, may I finish? Defendant's reliance on 3348 in this context is incorrect because 3348 provides a remedy only for the exercise of exclusive and non-delegable functions, which is plainly not the case here. All right. Thank you very much. We thank all counsel for their helpful arguments, and the case is submitted, and we are adjourned.
judges: THOMAS, MILLER, Blumenfeld